UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION


CHLOE DEVEREAUX,                 )
                                 )
              Plaintiff,         )
                                 )
       v.                        )      No. 4:07 CV 1692 RWS
                                 )                        DDN
MICHAEL J. ASTRUE,               )
Commissioner of                  )
Social Security,                 )
                                 )
              Defendant.         )


**REPORT AND RECOMMENDATION**
**OF UNITED STATES MAGISTRATE JUDGE**

This action is before the court for judicial review of the final
decision of defendant Commissioner of Social Security denying the
applications of plaintiff Chloe Devereaux for disability insurance
benefits and supplemental security income under Title II and Title XVI
of the Social Security Act (the Act), 42 U.S.C. §§ 401, et seq., and
1381, et seq.  The action was referred to the undersigned United States
Magistrate Judge for review and a recommended disposition under 28
U.S.C. § 636(b).  For the reasons set forth below, the undersigned
recommends that the ALJ's decision be affirmed.


**I.  BACKGROUND**

Plaintiff Chloe Devereaux was born on January 29, 1960. (Tr. 44.)
She is 5'5" tall with a weight that has ranged from 130 pounds to 151
pounds. (Tr. 133, 236, 744.)  She is married, but separated from her
husband, and lives alone. (Tr. 89.)  She has three adult children, and
four grandchildren. (Tr. 227.)  She completed high school and two years
of community college, earning an associate's degree. (Tr. 26.)

Devereaux applied for disability insurance benefits and
supplemental security income on December 14, 2005, alleging she became
disabled on April 10, 2003, due to knee problems, arm problems, carpal
tunnel syndrome, back pain, severe depression, and panic attacks. (Tr.
80-91, 134.)  The application was initially denied on April 14, 2006.
(Tr. 51-55.)  After a hearing on April 11, 2007, the ALJ denied benefits

on May 12, 2007. (Tr. 12-22; 24-43.) On September 1, 2007, the Appeals Council denied plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner. (Tr. 4-6.)

## II. MEDICAL HISTORY

On May 10, 1990, Timothy Loth, M.D., performed carpal tunnel release surgery on Devereaux's right wrist, to relieve her carpal tunnel syndrome.[1] On July 20, 1990, Dr. Loth performed the same surgery on her left wrist. (Tr. 304-05.)

On July 24, 2000, Devereaux saw Mitchell Mirbaha, M.D., complaining of pain in her hips and knees. The pain kept her up at night, and made standing and walking difficult. Her hip pain had been present for the last two years, while her knee pain had been present for several years, but getting progressively worse. Rotating the tibia and the femur produced severe pain in the knees. McMurray's test caused pain in the lateral joint line, and rotating the hips caused pain in that area.[2] X-rays of the right and left knee revealed no bony abnormalities. (Tr. 170.)

On July 26, 2000, Dr. Mirbaha reviewed an MRI of Devereaux's knees. The MRI of the right knee revealed no evidence of chondroid degeneration or any tears.[3] The ligaments, patella, and quadriceps tendons were all intact.[4] There was a slight subchondral cyst forming and some slight

---

[1]Carpal tunnel release is a surgery to treat carpal tunnel syndrome, a syndrome associated with pain and weakness in the hand caused by pressure on the median nerve at the wrist. National Institutes of Health, http://www.nlm.nih.gov/medlineplus/ency/article/002976.htm (last visited January 5, 2009).

[2]McMurray's test is used to evaluate individuals for tears in the meniscus, a fibrocartilaginous structure of the knee. Stedman's Medical Dictionary, 944, 1571 (25th ed., Williams & Wilkins 1990).

[3]Chondroid refers to cartilage. Stedman's Medical Dictionary, 298.

[4]The patella refers to the kneecap. Stedman's Medical Dictionary, 1149.

thinning of the cartilage.[5]  There was also some spurring of the tibial spines and joint effusion.[6]  The MRI of the left knee revealed chondroid degeneration of the medial meniscus at the posterior horn, but the remainder of the meniscus was normal.  The ligaments and tendons were intact.  There was evidence of some spurring and subchondral cyst formation involving the patella, and joint effusion.  (Tr. 188-89.)

On July 31, 2000, Wenzel Vas, M.D., reviewed an MRI of Devereaux's hips.  The MRI revealed that the bone marrow signal of both femoral heads, necks, and proximal shafts were normal.  There was no evidence of avascular necrosis of the right or left femoral head.[7]  There was no joint effusion.  (Tr. 187A.)

On August 11, 2000, Dr. Mirbaha noted that MRI studies of Devereaux's hip and knee were negative, though the studies showed some osteoarthritic changes.  He recommended a conservative line of treatment, physical therapy, and anti-inflammatory medication. Devereaux said her work schedule made the physical therapy impossible. Dr. Mirbaha prescribed Vioxx.[8]  In a follow-up, Devereaux thought the Vioxx was helping.  (Tr. 171.)

On September 25, 2000, Devereaux saw Dr. Mirbaha complaining of pain in her knees.  A physical examination showed Devereaux had symptoms

---

[5]A cyst is an abnormal sac containing gas, fluid, or a semisolid material with a membranous lining.  Stedman's Medical Dictionary, 387. Subchondral means situated below cartilage.  See id., 297.

[6]A spur, or calcar, is a small projection from a bone.  Stedman's Medical Dictionary, 227.  Effusion is the escape of fluid from the blood vessels into the tissues or into a cavity.  Id., 491.

[7]Avascular necrosis is the death of bone tissue due to a lack of blood supply.  This can lead to tiny breaks in the bone and the bone's eventual collapse.  Avascular necrosis most often affects the head of the thighbone (femur), causing hip pain.  MayoClinic.com, http://www.mayoclinic.com/health/avascular-necrosis/DS00650 (last visited January 5, 2009).

[8]Vioxx was used to treat arthritis pain, but is no longer prescribed.  WebMD, http://www.webmd.com/drugs (last visited January 5, 2009).

of patella pressure syndrome or Plica syndrome.[9] Dr. Mirbaha suggested arthroscopic knee surgery, and Devereaux agreed to have the procedure. (Id.)

On October 6, 2000, Devereaux underwent arthroscopic surgery on her left knee, with extensive chondroplasty of the patella, followed by removal of the torn medial meniscus.[10] The surgery revealed a partial tear of the anterior horn of the medial meniscus, and degenerative chondritis and chondromalacia of the patella.[11] (Tr. 172, 203.)

On November 30, 2000, Devereaux had good range of motion and good strength in her knee. She said the knee felt better than it did before the surgery, and that she no longer wanted to have surgery on the right knee. (Tr. 173.)

On December 26, 2000, Devereaux underwent arthroscopic surgery on her right knee, extensive chondroplasty of the patella, and lateral release and synovectomy.[12] She was discharged the same day. The surgery revealed a marked degree of chondromalacia of the patella, but that the ligaments and menisci were normal. (Tr. 174, 193-94.)

On February 5, 2001, Devereaux had no complaints about her knee surgery. An examination showed good range of motion in both knees, with no evidence of fluid accumulation. She reported being very happy with the results of the surgeries, and no longer having the pain she once had. (Tr. 176.)

On April 29, 2002, Devereaux saw Dr. Mirbaha, complaining of pain

---

[9]Plica syndrome occurs when plicae (bands of remnant synovial tissue) are irritated by overuse or injury. Plica syndrome produces pain and swelling, and locking and weakness of the knee. National Institute of Arthritis and Musculoskeletal and Skin Diseases, http://www.niams.nih.gov/Health_Info/Knee_Problems/default.asp (last visited January 5, 2009).

[10]Chondroplasty is reparative or plastic surgery of cartilage. Stedman's Medical Dictionary, 298.

[11]Chondritis is inflammation of cartilage. Stedman's Medical Dictionary, 297. Chondromalacia is the softening of any cartilage. Id., 298.

[12]A synovectomy is the surgical removal of the membrane of a joint. Stedman's Medical Dictionary, 1541.

in the right elbow and hand, over the last two months. She denied any accident or injury. A physical examination suggested proximal tendinitis of the elbow, but x-rays showed no bony abnormalities. Dr. Mirbaha injected the tender area with a Xylocaine mixture that provided relief. Devereaux also complained of pain at the right thumb joint. X-rays of the thumb showed only some osteoarthritic changes. Dr. Mirbaha applied a thumb splint, prescribed Celebrex, and scheduled a follow-up in two weeks.[13] (Tr. 176-77.)

On July 15, 2002, Devereaux underwent an MRI of her right elbow. The MRI revealed lateral epicondylitis, and edema adjacent to the common extensor tendon, which Dr. Mirbaha believed could be related to epicondylitis.[14] There was also spurring around the elbow joint, but the tendons and muscles around the elbow were normal, and there was no joint effusion. X-rays of the elbow were negative, and Devereaux had full range of motion in her elbow. Dr. Mirbaha recommended right elbow surgery to remove the degenerative portion of the tendon. (Tr. 178-79, 195, 198.)

On August 10, 2002, a Monsanto form, signed by a physician, indicated Devereaux could return to work with no limitations. (Tr. 346.)

On August 19, 2002, a workers' compensation initial history form indicated that Devereaux had injured both elbows while on the job. She had been watering plants, pushing 350-pound carts, and planting and transporting containers just before being injured. (Tr. 344.)

On October 3, 2002, Devereaux saw Shelby K. Kopp, M.D., complaining about pain in her right arm. The pain started about three months earlier, after Devereaux had watered and potted several thousand plants, while working. Dr. Kopp diagnosed her with lateral epicondylitis, prescribed Vioxx, and scheduled her for physical therapy three times a

---

[13]Celebrex is an anti-inflammatory drug used to treat arthritis. WebMD, http://www.webmd.com/drugs (last visited January 5, 2009).

[14]Lateral epicondylitis, or Tennis elbow, refers to an infection or inflammation of the epicondyles - projections from a long bone. Stedman's Medical Dictionary, 521. Edema is an accumulation of watery fluid in cells, tissues, or cavities. Id., 489.

week, for one week.  (Tr. 205-06.)

On October 10, 2002, Brian Murphy, PT, completed a physical therapy report.  Devereaux reported feeling about the same, and was still unable to avoid any lifting with her palm down.  Stretching and icing only provided temporary relief.  (Tr. 212-13.)

On October 10, 2002, Dr. Kopp cleared Devereaux to return to work, but told her to limit the use of her right arm, and to avoid any lifting with the palm down.  (Tr. 320.)

On October 15, 2002, Devereaux saw Dr. Kopp, complaining of worsening symptoms in her right arm, including numbness, and developing pain in her left arm.  Devereaux said the medication was not helping. A physical examination showed tenderness of the lateral epicondyle. Devereaux had full range of motion in the right elbow, but with pain. The left elbow had mild tenderness to palpation.  Dr. Kopp diagnosed her with lateral epicondylitis in both elbows, but more prominent in the right.  She also diagnosed her with right cubital tunnel syndrome, prescribed Darvocet, and scheduled more physical therapy.[15]  Dr. Kopp told Devereaux to avoid forced gripping or squeezing, hard repetitive manual work, and seeding and watering activities.  (Tr. 215-16.)

On October 18, 2002, Devereaux saw C. Douglas Meadows, M.D.  A physical examination showed positive tennis elbow, and pain to direct palpation over both epicondyles.  She had Tinel's sign on both ulnar nerve areas, and her right forearm was tender to palpation.[16]  Pinwheel testing indicated loss of, or decreased, sensation over the ulnar aspects.  Dr. Meadows diagnosed Devereaux with bilateral epicondylitis, right medial epicondylitis, and ulnar nerve pain.  He recommended

---

[15]Cubital tunnel syndrome is a syndrome associated with pain and weakness in the elbow, caused by pressure on the ulnar nerve.  Stedman's Medical Dictionary, 377.  Darvocet is a drug with a narcotic component and is used to treat mild to moderate pain.  WebMD, http://www.webmd.com/drugs (last visited January 5, 2009).

[16]Tinel's sign is a sensation of tingling, or of "pins and needles," felt in the distal extremity of a limb, when percussion is made over the site of an injured nerve.  Stedman's Medical Dictionary, 1422.

Devereaux see a physiatrist,[17] and refilled her prescriptions of Darvocet and Bextra.[18]  Dr. Meadows indicated Devereaux could return to work, but that she avoid repetitive lifting over five pounds, that she wear a splint, that she not use any impact or power tools, and that she avoid pulling and pushing.  (Tr. 217-18, 347.)

On October 22, 2002, Brian Murphy noted that Devereaux's condition had not changed.  He believed she would not make any more progress, and recommended discontinuing physical therapy.  (Tr. 219-20.)

On October 22, 2002, Devereaux saw Dr. Kopp, complaining of arm pain.  Devereaux had been taking her medication and following her work restrictions, but her symptoms were not improving.  A physical examination showed tenderness of the lateral epicondyle, moderate pain on extension, and decreased grip strength in the right elbow.  The left elbow showed tenderness at the ulnar groove and cubital tunnel syndrome.  Dr. Kopp diagnosed her with lateral epicondylitis and left cubital tunnel syndrome, and recommended she continue to follow her work restrictions.  (Tr. 321.)

On October 30, 2002, David M. Brown, M.D., examined Devereaux.  Dr. Brown found no visible swelling in either upper extremity.  Devereaux had good active range of motion in her elbows, wrists, and hands, but some mild diffuse tenderness on the right elbow.  Tinel's sign was negative, as was a direct compression test over both cubital tunnels.  She had good sensation and blood flow to all fingers in both hands.  Three x-rays revealed no significant bone or joint abnormality.  Dr. Brown recommended that Devereaux wear a forearm brace, but saw "no objective reason why she cannot return to work without restrictions." Devereaux was agreeable to these conditions.  (Tr. 389, 392.)

On November 13, 2002, Dr. Brown cleared Devereaux to work without restrictions.  He had no clear explanation for Devereaux's symptoms in the right upper extremity.  (Tr. 356, 396.)

On November 18, 2002, Isin Akduman, M.D., reviewed an MRI of

_____

[17]A physiatrist is a physician who specializes in physical medicine.  Stedman's Medical Dictionary, 1197.

[18]Bextra is used to treat pain and loss of function.  WebMD, http://www.webmd.com/drugs (last visited November 18, 2008).

Devereaux's right elbow.  The MRI revealed the muscles and tendons were intact, with no evidence of any lesions or of epicondylitis.  There was some joint effusion, but otherwise, no significant pathology.  (Tr. 408.)

On November 19, 2002, David M. Peeples, M.D., reviewed nerve conduction studies.[19]  The studies were well within normal limits.  There was no electrodiagnostic evidence of right median or ulnar neuropathy.  A physical examination showed no tissue swelling or muscle atrophy, and that Tinel's sign and Phalen's sign were negative.[20]  (Tr. 403.)

On December 11, 2002, Devereaux saw Dr. Brown, complaining of "hot pokes" to her right elbow, and pain up and down her right arm.  She also complained of spasms and a cold feeling in her right arm.  A physical examination showed good range of motion in the elbow, wrist, and fingers, but some tenderness.  The elbow was stable, and provocative tests for cubital and carpal tunnel syndrome were negative.  Her grip strength was 40 pounds in the right hand and 63 pounds in the left.  Dr. Brown cleared her to return to work without restriction.  (Tr. 375, 386.)

On March 12, 2003, David T. Volarich, D.O., completed an independent medical examination.  The examination was based on Devereaux's subjective complaints, objective medical records, and Dr. Volarich's own testing and examination.  Dr. Volarich noted that he was not one of Devereaux's treating physicians.  The examination revealed that Devereaux had full range of motion at the elbows.  However, she had considerable pain to palpation at the medial and lateral epicondyles of the right elbow.  The cubital tunnel was also tender to palpation, and Devereaux tested positive for Tinel's sign.  There was no significant

---

[19]Nerve conduction studies measure how well and how fast the nerves can send electrical signals.  Nerve conduction studies are often used to help find nerve disorders.  WebMD, http://www.webmd.com/brain/electromyogram-emg-and-nerve-conduction-studies (last visited January 5, 2009).

[20]Phalen's sign is used to test for carpal tunnel syndrome.  WebMD, http://www.webmd.com/pain-management/carpal-tunnel/physical-exam-for-carpal-tunnel-syndrome (last visited January 5, 2009).

swelling or crepitus in the right elbow.[21] The left elbow produced moderately severe pain to palpation at the medial and lateral epicondyles. The cubital tunnel was also tender to palpation, and Tinel's sign was positive. Devereaux had full range of motion in the wrists, but she tested positive for Phalen's and Tinel's sign in the ulnar distribution of each wrist. She tested negative for deQuervain's tenosynovitis.[22] There was no significant atrophy, and tests for carpal instability were negative. (Tr. 409-17.)

Dr. Volarich diagnosed Devereaux with overuse syndrome in the right and left upper extremity, most consistent with medial and lateral epicondylitis, as well as ulnar nerve entrapment, or pinching, at the elbow. Dr. Volarich also diagnosed her with right thumb extensor tenosynovitis. He ruled out bilateral wrist ulnar nerve entrapment. Dr. Volarich attributed the overuse syndrome to the repetitive nature of Devereaux's movements while working at the Monsanto greenhouse. He did not believe she had achieved maximum medical improvement, and recommended cortisone injections at the elbows, braces and pads for the elbows and arms, physical therapy, and repeat nerve conduction studies. The results of the nerve conduction studies would determine whether surgery would be a recommended option. Dr. Volarich believed Devereaux was able to perform most activities for self-care within reason, and was reluctant to offer permanent limitation on her upper extremities given her potential for medical improvement. He did, however, advise Devereaux to avoid repetitive gripping and squeezing, to avoid handling weights weighing more than five or ten pounds, and to avoid impacts and vibrations to her hands. (Id.)

On June 11, 2003, Devereaux complained of chest pain and shortness

---

[21]Crepitus, or crepitation, refers to crackling, and can be the noise or vibration produced by rubbing bone or irregular cartilage surfaces together. Stedman's Medical Dictionary, 368.

[22]Tenosynovitis is inflammation of a tendon. Stedman's Medical Dictionary, 1562. DeQuervain's tenosynovitis is a condition brought on by irritation or inflammation of the wrist tendons at the base of the thumb. American Society for Surgery of the Hand, http://www.assh.org/Content/NavigationMenu/PatientsPublic/HandConditions/deQuervainsTendonitis/deQuervain_s_Tendon.htm. (last visited January 5, 2009).

of breath. An x-ray of the chest showed no evidence of any acute cardiopulmonary process. (Tr. 277.) That same day, Devereaux saw Felice A. Rolnick, M.D., complaining of increasing spasms in the upper extremities. A respiratory tract infection was getting better, but still producing diarrhea. Dr. Rolnick diagnosed her with hyponatremia, chronic diarrhea, and upper extremity spasms, and continued her on Celexa.[23] (Tr. 274-76.)

On July 30, 2003, Dr. Brown examined Devereaux. Her nerve conduction studies were normal and revealed no evidence of any right or left ulnar neuropathy. Provocative tests for entrapment were negative. A physical examination showed no visible swelling, and that Devereaux maintained active range in both elbows, wrists, and all her fingers. Provocative tests for cubital tunnel and carpal tunnel syndrome were negative for each hand. There was no intrinsic muscle atrophy, she had good grip strength, and sensation and blood flow in both hands. This was Dr. Brown's eighth time examining Devereaux, which included two separate nerve conduction studies and an MRI of the elbow. All of the tests were "unrevealing." Dr. Brown had no further treatment recommendations and cleared her to return to work, full duty, with no restrictions. (Tr. 369.)

On September 15, 2003, Dr. Brown completed a final rating report on Devereaux. He found she had a 0% partial permanent disability. He had last examined her on July 30, 2003. (Tr. 367.)

On December 9, 2003, Devereaux saw Susan Reynolds, M.D. The treatment notes indicate Devereaux was going through a difficult divorce, and was interested in seeing a psychiatrist. She complained of explosions of rage, increased chest pains, trouble sleeping, and increased thoughts of suicide, but with no specific plan. (Tr. 238.)

On December 11, 2003, Dr. Reynolds reviewed a stress echocardiography, after Devereaux complained of chest pains. The test was negative. Another test showed Devereaux had normal sinus rhythm.

---

[23]Hyponatremia is an abnormally low concentration of sodium ions in the circulating blood. Stedman's Medical Dictionary, 751. Celexa is used to treat depression. WebMD, http://www.webmd.com/drugs (last visited January 5, 2009.

On January 21, 2004, Bruce Schlafly, M.D., of Hand Surgery Associates, wrote to the Floyd Law Firm, detailing his examination of Devereaux. In April 2002, Devereaux said she began to experience pain in her elbow, and numbness and tingling in her fingers. Devereaux attributed these sensations to the repetitive work she did in the Monsanto greenhouses. At the time of the visit, Devereaux was still experiencing the pain, numbness, and tingling. A physical examination revealed tenderness on the medial aspect of each elbow, and positive Tinel's sign over the ulnar nerve at each cubital tunnel. She had good range of motion in her hands, wrists, forearms, and elbows, but had some restriction in her right thumb. She had 51, 52, and 42 pounds of grip strength in her right hand after three successive tests, and 50, 44, and 50 pounds of grip strength in her left hand after three successive tests. Dr. Schlafly diagnosed Devereaux with bilateral cubital tunnel syndrome, and recommended surgery at each elbow for transposition of the ulnar nerve. Dr. Schlafly attributed Devereaux's impairments to the repetitive motions she performed while in the greenhouses. He could not come up with a specific diagnosis for the right thumb, and did not find any evidence of recurrent carpal tunnel syndrome. He advised Devereaux to avoid lifting more than 10 pounds with either arm, and to avoid forceful elbow flexion and extension. If Devereaux was unable to receive additional treatment, Dr. Schlafly estimated that she had a 35% permanent partial disability of each elbow. (Tr. 486-90.)

On January 28, 2004, Devereaux called for a prescription of Vicodin.[24] She had been to the emergency room on January 21, 2004, complaining of pain. At the time, she was given a prescription for Vicodin, but told she would not be given a refill. (Tr. 465.)

On February 2, 2004, Devereaux saw Dr. Reynolds. The medical notes indicate Devereaux was no longer having crying spells, but still had mood swings. She had cubital tunnel syndrome in both elbows. She was trying to sell real estate, and was seeing Craig Voorhees, Ph.D, a

---

[24]Vicodin is a combination narcotic and non-narcotic, and is used to relieve moderate to severe pain. WebMD, http://www.webmd.com/drugs (last visited January 5, 2009.

psychiatrist, regularly.  (Tr. 236-37.)

On March 3, 2004, an x-ray revealed early arthritic changes at the carpometacarpal joint of the right thumb.  (Tr. 480.)

On March 12, 2004, Dr. Schlafly performed an anterior submuscular transposition of the right ulnar nerve, to correct Devereaux's right cubital tunnel syndrome.  An examination revealed that Devereaux tested positive for Tinel's sign over the ulnar nerve of the right cubital tunnel.  At the time, she was alert and oriented.  (Tr. 269-70, 455.) On April 30, 2004, Dr. Schlafly performed the same surgery on Devereaux's left ulnar nerve.  (Tr. 264-65, 420.)

On June 17, 2004, Shepherd M. Abrams, M.D., reviewed x-rays of Devereaux's chest.  The x-rays revealed no active cardiopulmonary diseases.  (Tr. 223, 299.)

On August 7, 2004, Devereaux called the suicide hotline.  She and her husband had been fighting, and Devereaux was considering overdosing on Xanax.[25]  She was having crying spells and symptoms of depression recently.  Devereaux was urged to admit herself to the Hyland Center. Devereaux smoked two packs a day, for the past thirty years, and had no interest in quitting.  She denied alcohol or drug use.  She had been working at Monsanto, but could no longer perform that job because of her elbow problems.  She tried to sell real estate, but was not a sales person.  A physical examination showed Devereaux had a regular heart rate and rhythm, with no murmurs, her lungs were clear, and abdomen was soft and nontender.  She had a slender frame.  There was no lower extremity edema or crepitus in her knees.  She was mildly tender to palpation on the patellae.  Barbara O'Brien, D.O., diagnosed her with pain from post-ulnar decompression, osteoarthritis, tobacco addiction, chronic bronchitis, and suicidal ideation and major depression.  (Tr. 227-28.)

On August 7, 2004, Devereaux was admitted to the Hyland Behavorial Health Center, reporting suicide ideation.  Devereaux did not have a past history, and did not think she had any chemical dependencies.  She had stopped taking Paxil and Prozac because it depressed her sexual

---

[25]Xanax is used to treat anxiety and panic disorders.  WebMD, http://www.webmd.com/drugs (last visited January 5, 2009).

interest, and because she did not think the Paxil was effective.[26]  She
wanted to improve her marriage.   Devereaux noted her father was an
alcoholic, and reported being physically and mentally abused by him
between the ages of 3 and 18.   Her mother abandoned her at age 16, and
she never reconciled with her mother.   Devereaux had been separated from
her husband for two years, but the two were now living together in an
apartment.   Srinivas Chilakamarri, M.D., noted her appearance was very
sad, fatigued, and disheveled.   Her motor activity and speech were slow.
Her behavior was cooperative and her flow of thought was not tangential.
She was neither manic nor psychotic.   Her thought content showed no
overt signs of suicidal or homicidal ideation, but did show a lot of
despondency and despair.   Her memory was good, her intellect was
average, and her orientation intact.   Dr. Chilakamarri diagnosed
Devereaux with mood disorder and noncompliance with her medication.   He
noted questionable personality disorder issues, and assigned her a GAF
score of 30.[27]  (Tr. 248-49, 260.)

On September 10, 2004, Devereaux was discharged from the Hyland
Center, following a diagnosis of major recurrent depression.   She was
assigned a GAF score of 50.[28]  (Tr. 247.)

---

[26]Paxil is used to treat depression, panic attacks, obsessive-
compulsive disorder, anxiety disorders, and post-traumatic stress
disorder.   Prozac is used to treat depression.   WebMD,
http://www.webmd.com/drugs (last visited January 5, 2009).

[27]A GAF score, short for Global Assessment of Functioning, helps
summarize a patient's overall ability to function.   A GAF score has two
components.   The first component covers symptom severity and the second
component covers functioning.   A patient's GAF score represents the
worst of the two components. On the GAF scale, a score of 30 represents
behavior that is considerably influenced by delusions or hallucinations
or serious impairment in communication or judgment (such as incoherency,
acting grossly inappropriately, preoccupation with suicide), or an
inability to function in almost all areas (for example, staying in bed
all day, or having no job, home, or friends).   Diagnostic and
Statistical Manual of Mental Disorders, 32-34 (4th ed., American
Psychiatric Association 2000).

[28]On the GAF scale, a score of 50 represents serious symptoms (such
as thoughts of suicide, severe obsessional rituals, frequent
shoplifting), or any serious impairment in social, occupational, or
school functioning (such as the inability to make friends or keep a
job). Diagnostic and Statistical Manual of Mental Disorders, 32-34.

On September 16, 2004, Jeanne Allard, MA, LCSW, completed a counselor's discharge summary. Devereaux had come to the Hyland Center with a great amount of stress, and having overdosed on Xanax. She also had a history of abusing Vicodin and Valium.[29] At the same time, she was adjusting to the medications to treat her depression and oversee her withdrawal problems. Devereaux was encouraged to focus on her own problems; she had been focusing exclusively on her husband's alcoholism. Devereaux was going to attend a 12-step program to help with her medication abuse. At discharge, Devereaux was not making threats to harm herself or anyone else. She noted feeling better physically, with a more stable mood, and more positive attitude than when she first arrived. Allard recommended Devereaux see a private therapist, which could include marital sessions. (Tr. 247.)

On October 6, 2005, Devereaux completed an adult function report. She lived alone in a house. In a typical day, she made herself coffee, got dressed, took the dog out, made her bed, and read her horoscope. She might try and clean the house, either doing dishes or wiping the curtains. She would take her Ibuprofen and then three hours into the day, take an hour nap.[30] After her nap, she would take the dog out again, fix dinner - a sandwich or something - take more Ibuprofen, and watch some television before falling asleep. She would sometimes take care of her husband (if he had undergone a surgery, for instance), or her children. (Tr. 113-14.)

Before her impairments, Devereaux noted being able to clean, work, take care of her children and husband, work in the yard, walk for extended periods, jog, and read for long periods. She had trouble sleeping, with her hips burning at night. She no longer had much of an appetite, and did not have the money to cook. She typically eats only a sandwich, once a day. She avoided lifting her pots and dishes for

---

[29]Valium is used to treat anxiety, seizures, and can also be used to relieve muscle spasms. WebMD, http://www.webmd.com/drugs (last visited January 5, 2009).

[30]Ibuprofen, or Motrin, is an anti-inflammatory drug used to relieve pain and swelling. WebMD, http://www.webmd.com/drugs (last visited January 5, 2009).

fear of dropping them.  She tried to complete one cleaning task each day, but no longer worked in the yard.  She could drive herself, but only until her knees and arms began to hurt.  She no longer had a bank account because she had overdrawn her savings and needed a $100 to reactivate her account.  (Tr. 114-116.)

Her only activity involved caring for her dog.  Her children came over to her house once a week to visit, and helped her do laundry or clean the house.  She had problems getting along with others.  She could only walk twenty feet before needing ten minutes to rest.  She could pay attention for thirty minutes at a time.  She could follow instructions, but if it required too much effort, she might try something else.  She had a hard time concentrating – if anything required a lot of mental or physical work, she could not do it.  She did not handle stress well, but indicated she could handle a change in routine.  At the end of the report, Devereaux wrote that completing the forms required a lot of concentration, and was frustrating.  (Tr. 116-20.)

On December 5, 2005, Devereaux completed a work history report. She noted working in a number of different jobs from May 1992 up until the present.  She worked the longest at the Missouri Department of Mental Health, where she worked from June 1993 until August 2001.  As part of that job, she worked nine hours a day, four to five days a week. The job required frequently lifting up to fifty pounds, and sometimes lifting a hundred pounds or more.  She needed to lift and carry the patients on a daily basis, assisting them with bathing, dressing, and other needs.  She handled objects eight hours a day and stood for seven hours a day.  She was a lead worker and supervised staff as well.  At the end of the report, Devereaux noted she had been working since she was 18 years old, moving from lifting and carrying furniture, to people, and then to plants.  "Unfortunately, it's the repetition that breaks down the joints."  She had undergone surgery to repair some of the damage, but still experienced constant pain in her hands, elbows, back, hips, and knees, "at all times, regardless of what employment I do . . . ."  Her depression was the result of the frustration at not being able to control her pain.  (Tr. 104-11, 136.)

On December 8, 2005, her son, Chris Johnson, completed a third-

party function report.  He noted seeing his mother three hours a week.
She was unable to clean the house, walk, cook, or sleep like she was
used to doing.  He helped her clean the house during his visits.  His
mother used to be happy, but now she simply cried all the time.  Her
back pain was constant, and she no longer wanted to go outside, cook,
or drive.  (Tr. 121-29.)

On December 20, 2005, A. Rashid Qureshi, M.D., reviewed a stress
electrocardiogram.  The test revealed no ischemia and no significant
arrhythmia.[31]  (Tr. 290.)

On December 20, 2005, A. Joshi, M.D., noted that Devereaux was
oriented and denying any suicidal or homicidal ideas.  (Tr. 531.)

On December 27, 2005, Devereaux went to the emergency room,
complaining of a six-month history of nausea, shortness of breath,
weakness, and chest pressure.  Activity aggravated the pain.  At the
time, she was taking Prozac and Xanax.  A physical examination showed
her heart was normal, lungs were clear, abdomen was soft, and that she
had no edema in the extremities.  She was alert and oriented, with no
focal deficits.  Dr. Rolnick diagnosed her with depression and chest
pain, though not cardiac.  She was discharged and told to follow-up with
her primary care physician.  (Tr. 286-87.)

On December 28, 2005, Dr. Rolnick reviewed a myocardial perfusion
study.  The study revealed no evidence of any defect related to
myocardial blood flow.  (Tr. 288.)

In March 2006, Dr. A. Joshi completed a medical report for the
Missouri Department of Social Services.  Dr. Joshi noted that Devereaux
suffered from general anxiety disorder, neck pain, knee pain, and elbow
pain, and was taking Prozac and Xanax.  Dr. Joshi indicated she had
decreased grip strength and unstable knees, and checked the box
indicating Devereaux's impairment was permanent.  No other details or
explanations were provided in support of this determination.  (Tr. 529-
30.)

On April 3, 2006, Musaddeque Ahmad, M.D., examined Devereaux.  The

_____

[31]Ischemia is local anemia due to mechanical obstruction (mainly
arterial narrowing) of the blood supply.  Stedman's Medical Dictionary,
803.  Arrhythmia is an irregular heart beat.  Id., 120.

-16-

physical examination revealed Devereaux was well dressed and groomed, alert, oriented, and in no acute distress. Her gait was normal, and Dr. Ahmad noted no abnormalities in the musculoskeletal system, but found Devereaux depressed. At the same time, Dr. Ahmad noted Devereaux looked stable and that it seemed her depression was under control. With medication, Dr. Ahmad believed Devereaux did not have any limitation in mental functioning. From a physical standpoint, Dr. Ahmad believed that Devereaux could sit and stand for 6 to 8 hours a day with rest, could lift and carry up to 20 pounds, and would have no limitations with respect to handling objects, seeing, or hearing. (Tr. 537-38.)

On April 13, 2006, Joan Singer, Ph.D., completed a psychiatric review. Dr. Singer found that Devereaux suffered from anxiety-related disorders and affective disorders, but that these impairments were not severe. Dr. Singer diagnosed Devereaux with major depression and general anxiety disorder. Dr. Singer marked that Devereaux had a mild degree of limitation with respect to daily living activities, maintaining social functioning, and maintaining concentration. Dr. Singer found that Devereaux had not experienced any episodes of extended decompensation. Dr. Singer found Devereaux's complaints partially credible, but not supportive of a finding of disabled. Dr. Singer concluded that Devereaux's mental impairments did not significantly impact her functioning, and were therefore non-severe. (Tr. 541-53.)

On April 13, 2006, B. Huffman completed a case analysis. Reviewing the totality of the findings in the file, Huffman concluded that there was no medically determinable impairment. (Tr. 555.)

On April 27, 2006, Suren Chaganti, M.D., J.D., completed a psychiatric examination. Dr. Chaganti found Devereaux depressed, with a sense of helplessness and hopelessness. She felt persecuted, but denied hallucinations. She was cooperative, and her speech was clear and soft. Devereaux denied any suicidal or homicidal ideation. Dr. Chaganti diagnosed Devereaux with major depressive disorder, assigned her a GAF score of 25-30, and prescribed Wellbutrin.[32] (Tr. 557-58.)

---

[32]Wellbutrin is an antidepressant used to treat depression and mood disorders. WebMD, http://www.webmd.com/drugs (last visited January 5, 2009).

Dr. Chaganti saw Devereaux again on May 28, and June 22, 2006, with no significant changes. (Tr. 559-60.)

On May 2, 2006, Dr. Edward W. Szoko reviewed an MRI of Devereaux's back. The MRI showed no evidence of any fractures, subluxation or bone destruction.[33] There was no spondylolysis and the disk spaces appeared to be of average height.[34] Devereaux had been complaining of back pain. (Tr. 653.)

On August 29, 2006, Devereaux was admitted to the emergency room, complaining of suicide ideation, with the specific thought of driving off the road. She also complained of a depressed mood, low energy, feelings of helplessness and hopelessness, trouble sleeping and concentrating, and poor appetite. She denied having any thoughts about harming herself, but did think about killing her brother-in-law. She was living with her husband, though they had been separated on and off for the past five years. She said her husband had abused her in the past, but not recently. She did not have a good relationship with her three children. She reported taking her husband's Valium and Vicodin prescriptions for "motivation." Otherwise, she denied taking any medication on a regular basis. Jeffery A. Vander Kooi, M.D., diagnosed Devereaux with major depression, and relationship difficulties with her husband and children, and assigned her a GAF score of 40.[35] He prescribed her Celexa. A mental examination showed Devereaux was calm and cooperative, with normal speech. He found her positive for some suicidal ideation, but that it was passive at the time. (Tr. 664-67, 690-91, 699.)

---

[33]Subluxation is an incomplete dislocation. The normal relationship is altered, but there is still some contact between joint surfaces. Stedman's Medical Dictionary, 1494.

[34]Spondylolysis is degeneration of the articulating, or joining, part of a vertebra. Stedman's Medical Dictionary, 1456.

[35]On the GAF scale, a score of 40 means there is impairment in reality testing or communication (such as speech that is at times illogical, obscure, or irrelevant), or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood (such as depressed, avoids friends, neglects family, and is unable to work). A score of 40 represents worse than serious symptoms. Diagnostic and Statistical Manual of Mental Disorders, 32-34.

On August 30, 2006, Dr. Kooi followed-up, and diagnosed Devereaux with major depression and assigned her a GAF score of 60.[36]  He prescribed Celexa and Ambien.[37]  A mental examination showed Devereaux was calm, cooperative, and maintained good eye contact.  She denied any suicidal or homicidal ideation, and denied any hallucinations or other psychotic symptoms.  She described her mood as "much better."  Her affect was euthymic, and she was alert and oriented.[38]  She was discharged in stable condition.  (Tr. 658-59.)

On September 14, 2006, Devereaux saw Mohinder Partap, M.D., at Psych Care Consultants, complaining of a history of depression, stress, and panic attacks.  She also noted trouble sleeping, crying spells, and fleeting suicidal ideation.  Dr. Partap diagnosed Devereaux with major depression and assigned her a GAF score of 50.  He increased her Citalopram and Lunesta, and continued her on Alprazolam.[39]  The medical notes indicate Devereaux had stopped taking her medication because of improvement, only to have relapsed.  (Tr. 729-31.)

On October 12, 2006, Devereaux saw Dr. Partap, complaining of crying spells and wanting to stay in bed.  (Tr. 728.)

On October 25, 2006, Devereaux saw Dr. Partap, complaining of feeling worse and very angry, with violent thoughts.  Devereaux complained of flash backs, in which her husband had sex with her mother, and made advances at her sister.  She said she did not trust her neighbors, and was suspicious of people in the malls.  She complained

---

[36]On the GAF scale, a score of 60 represents moderate symptoms (such as flat affect and circumstantial speech, occasional panic attacks), or moderate difficulty in social, occupational, or school functioning (such as few friends, conflicts with peers or co-workers). Diagnostic and Statistical Manual of Mental Disorders, 32-34.

[37]Ambien is used to treat insomnia.  WebMD, http://www.webmd.com/drugs (last visited January 5, 2009).

[38]Euthymia refers to a state of joyfulness, mental peace, and tranquility.  Stedman's Medical Dictionary, 545.

[39]Citalopram is an anti-depressant used to treat depression. Lunesta is used to treat insomnia.  Alprazolam is used to treat anxiety and panic disorders.  WebMD, http://www.webmd.com/drugs (last visited January 5, 2009).

of visual hallucinations (seeing shadows from the periphery), somatic hallucinations, and olfactory hallucinations.  Dr. Partap found her appearance appropriate, but noted Devereaux was depressed and anxious. He diagnosed her with psychosis, and prescribed Citalopram, Alprazolam, and Risperdal.[40]  (Tr. 728.)

On November 1, 2006, Devereaux saw Dr. Partap, noting she had improved a lot since her last visit.  She was going places, sleeping better, and experiencing some relief from her hallucinations and delusions.  She was still experiencing some auditory hallucinations (people saying bad things to her) and visual hallucinations (seeing bugs crawling on the floor).  Dr. Partap found her appearance and affect unremarkable.  He diagnosed her with paranoid schizophrenia.[41]  (Tr. 727.)

On November 9, 2006, Dr. Szoko reviewed an MRI of Devereaux's lumbar spine, after she complained of lower back pain, radiating down both legs.  The MRI revealed a degenerated disk with a ring-shaped tear at L4-5, and an associated diffuse disk bulge without herniation.[42]

---

[40]Risperdal is an anti-psychotic drug used to treat mental and mood disorders like schizophrenia.  WebMD, http://www.webmd.com/drugs (last visited January 5, 2009).

[41]Schizophrenia is a common type of psychosis, characterized by a disorder in the thinking process, such as delusions and hallucinations, and extensive withdrawal of the individual's interest in interacting with other people and the outside world.  Stedman's Medical Dictionary, 1390.

[42]The human spinal column consists of thirty-three vertebrae. There are seven cervical vertebrae (denoted C1-C7), twelve thoracic vertebrae (denoted T1-T12), five lumbar vertebrae (denoted L1-L5), five sacral vertebrae (denoted S1-S5 and fused together into one bone, the sacrum), and four coccygeal vertebrae (fused together into one bone, the coccyx).  The cervical vertebrae form part of the neck, while the lumbar vertebrae form part of the lower back.  The sacrum is immediately below the lumbar vertebrae.  Stedman's Medical Dictionary, 226, 831, 1376, 1549, 1710, Plate 2.  A herniated disk is a protruded or ruptured disk. The protrusion will compress the nerve root or the cauda equina.  Id., 260, 455.  The cauda equina is a collection of nerves below the end of the spinal cord, which travel down the thecal sac and go to the muscles and skin.  http://www.neurosurgerytoday.org.

There was no foraminal or canal stenosis.[43]  The MRI revealed a smaller diffuse disk bulge at L5-S1, without stenosis.  The bone marrow signal and distal spinal cord signal each appeared normal, and there was no evidence of any lesions.  (Tr. 735-36.)

On November 20, 2006, Dr. Partap completed a mental residual functional capacity questionnaire.  He diagnosed Devereaux as paranoid, with a GAF score of 35.[44]  Her highest GAF score was 50.  He noted Devereaux suffered from paranoia, and visual and auditory hallucinations.  He characterized Devereaux's mental ability to perform unskilled, semi-skilled, and skilled work, as seriously limited, but not precluded.  Devereaux did not have a low IQ or reduced intellectual functioning.  He estimated that Devereaux's mental impairments would cause her to miss more than four days of work a month.  Dr. Partap found Devereaux's impairments had lasted or could be expected to last for at least twelve months.  He did not believe Devereaux was a malingerer. (Tr. 737-41.)

On November 20, 2006, Devereaux saw Srinivasan Raghavan, M.D., complaining of extreme fatigue and back pain.  Devereaux noted her fatigue became worse over time.  She also had pain in all her joints, particularly in her hands, knees, and shoulders.  Reviewing her symptoms, Dr. Raghavan noted Devereaux suffered from degenerative disk disease, but with no obvious nerve compression.  She suffered from depression, but denied any suicidal ideation.  She scored high on a sleepiness score.  An x-ray of the shoulders, wrists, and hands showed some degree of degenerative joint disease, but nothing severe and no obvious abnormalities.  A physical examination showed Devereaux had some tenderness along the lumbar spine.  Her strength was 5/5, but straight leg raising could not be done because of significant pain.  Dr. Raghavan diagnosed Devereaux with extreme fatigue, fibromyalgia, depression,

_____

[43]Spinal stenosis refers to the narrowing of the spinal cord. Stedman's Medical Dictionary, 1473.

[44]A GAF score of 35 shares the same characteristics as a GAF score of 40.  See Note 34.

sleep apnea, pain, and weight gain.[45]  Dr. Raghavan suggested Cymbalta
for the fibromyalgia, continued Devereaux on the Celexa and Risperdal
to combat her depression, and gave her samples of Mobic for her pain.[46]
(Tr. 745-46, 751.)

On December 14, 2006, Devereaux saw Dr. Raghavan, complaining of
insomnia, depression, fibromyalgia, fatigue, hot flashes, and lower back
pain.  Dr. Raghavan prescribed Cymbalta for the fibromyalgia, and told
Devereaux she could take Vicodin periodically.[47]  Dr. Raghavan did not
think surgery could help her back pain, and referred Devereaux to pain
management.  (Tr. 744.)

On January 9, 2007, Devereaux saw Dr. Raghavan, complaining of
chronic pain, depression, anxiety, sleeplessness, and congestion.
Devereaux had been taking Mobic for the pain, but insurance no longer
paid for it, and was taking Ibuprofen instead.  She was also taking
Risperdal, Claritin, and Cymbalta.[48]  A physical examination showed
Devereaux was in no acute distress, alert, and oriented.  Palpation of
the lower back revealed significant tenderness along the paraspinal
muscles.  Dr. Raghavan recommended Cymbalta for her fibromyalgia, and
pain medications for her lower back pain.  (Tr. 743.)

On January 30, 2007, Devereaux saw Dr. Partap.  She denied any
auditory hallucinations and was able to ignore the occasional visual
hallucination.  She could go places, but was a little paranoid.  Her

---

[45]Fibromyalgia is a condition that causes fatigue, muscle pain, and
"tender points."  Tender points are places on the neck, shoulders, back,
hips, arms, or legs that hurt when touched.  Fibromyalgia is also
associated with difficulty sleeping, morning stiffness, headaches, and
problems with thinking and memory.  Medline Plus,
http://www.nlm.nih.gov/ medlineplus/fibromyalgia.html (last visited
January 5, 2009).

[46]Mobic, or Meloxicam, is used to treat arthritis. It reduces pain,
swelling, and stiffness of the joints.  WebMD,
http://www.webmd.com/drugs (last visited January 5, 2009).

[47]Cymbalta is used to treat major depression and anxiety.  WebMD,
http://www.webmd.com/drugs (last visited January 5, 2009).

[48]Claritin is an antihistamine that treats symptoms such as
itching, runny nose, watery eyes, and other allergies.  WebMD,
http://www.webmd.com/drugs (last visited January 5, 2009).

sleep was fair. She spent most of the day around the house, doing chores. (Tr. 752.)

On February 26, 2007, Devereaux saw Dr. Partap, complaining of joint pain. She reported spending the day in bed, with vague suicidal ideation on bad days. She blamed her depression on the poor quality of her sleep. She noted being able to ignore her hallucinations, but was still paranoid around people sometimes. Her appearance was appropriate, with a depressed to normal affect during the session. (Id.)

On March 22, 2007, Devereaux saw Dr. Partap, noting improvement since her last visit. She was able to ignore occasional auditory hallucinations (talk about her husband having affairs) and visual hallucinations (passing shadows). She was still getting paranoid when she went out of her house. He appearance, affect, and attitude were good during the session. (Id.)

On April 11, 2007, the ALJ wrote to Dr. Partap, asking for additional information. The ALJ stated that Dr. Partap's reports and/or medical source statements contained internal conflicts, did not contain all the necessary information needed to assess the severity of Devereaux's impairments, did not appear to be based upon medically acceptable techniques, and did not adequately address what Devereaux could do in spite of her impairments. (Tr. 754.) In response to the letter, Dr. Partap provided past progress notes from his sessions with Devereaux, but nothing else. (See Tr. 755-60, 765-67.)

On April 19, 2007, Devereaux saw Dr. Partap, reporting no complaints. She was spending most of her time caring for her disabled husband. She was able to ignore the hallucinations most of the time, but was still having trouble sleeping, and still suffering from paranoia. Her appearance, affect, and attitude were good during the session. (Tr. 766.)

On May 18, 2007, Devereaux saw Dr. Partap. She had undergone a gastric polypectomy a month ago.[49] She was able to ignore visual

---

[49]A polypectomy is a procedure to remove a polyp – any mass of tissue that bulges or projects outward or upward from the normal level. A polyp may be a tumor, an inflammation, lesion, or malformation. Stedman's Medical Dictionary, 1237.

hallucinations (shadows from the periphery), but had some trouble ignoring the auditory hallucinations (voices calling her hopeless after her social security disability claim was denied). Her sleep was fair. (Id.)

On June 13, 2007, Devereaux saw Dr. Partap. She reported spending her day doing household chores. She was able to go shopping, but had trouble sleeping because of back pain. She was able to ignore her visual hallucinations (flickering lights and black shadows) and her auditory hallucinations, which were insignificant. She suffered from panic attacks in public places. Her appearance and affect were good during the session. (Tr. 767.)

In an undated disability report appeal form, Devereaux noted that the home she was living in had been condemned, forcing her to live in her car. Her depression had also become worse, and she had started seeing a new primary doctor for her pain and depression. (Tr. 159.)

**Testimony at the Hearing**

On April 11, 2007, Devereaux testified before the ALJ. She had worked a number of jobs in the past - as a nurse's aid, a lab technician, a real estate agent, and a greenhouse worker for Monsanto. Devereaux had undergone surgery on her wrists and hands, and they still bothered her. Her thumbs were numb and stuck, and her hands also went numb. The muscles around her elbows were severed during a surgery, and she experienced a constant pain up and down her arms. She did not remember receiving any nerve conduction studies. (Tr. 24-29.)

Devereaux had undergone knee surgery, and still complained of pain when she walked or bent her knees. She had back problems, a result of a bulging disk, with the back pain radiating down her buttocks, legs, thighs, and down into her feet. She complained of fibromyalgia, noting her muscles ached and hurt all the time. The pain made it hard to move, get dressed, groom, and take care of her house and work. (Tr. 29-30.)

Devereaux also complained of psychological problems. She suffered from depression with psychosis, panic attacks, and had been diagnosed as bipolar. These impairments prevented her from being able to live a normal life. She could no longer drive or leave her house. She had

been admitted to St. Anthony's for psychological problems, and problems managing her prescription drugs. She had also sought out professional psychological care. At the time of the hearing, she was still going to Psych Care once a month, where she saw Dr. Partap. (Tr. 30-32.)

Devereaux was still having visual and auditory hallucinations. She saw shadows or people in front of her, and hear things. At times, she was suicidal. She had crying spells and panic attacks on a daily basis. The panic attacks were unpredictable, and typically lasted for about five minutes, though she needed time to relax and recover after they happened. Devereaux needed to lay down for about four hours in a day. She was able to take care of some of her needs, but needed help bathing, getting dressed, and getting undressed. Because of her leg and back problems, she had trouble sitting, standing, and walking. She did not think she could sit or walk for longer than ten minutes at a time. (Tr. 32-35.)

The palm of her hand and her thumb became numb, making it difficult to grip and feel certain objects. She had trouble with zippers and buttons when her hands got numb. Her elbow problems made it difficult to reach forward and overhead. In a typical night, she would only sleep for three hours. (Tr. 35-36.)

During the hearing, Dr. John McGowan testified as a vocational expert (VE). The ALJ had the VE assume that Devereaux could lift and carry up to twenty pounds occasionally and ten pounds frequently, and could sit, stand, and walk for six hours in an eight-hour day. The VE also assumed that she could understand, remember, and carry out at least simple instructions and non-detailed tasks, respond appropriately to supervisors and co-workers, and adapt to routine, simple work changes. Under this hypothetical, the VE testified that Devereaux could not return to any of her past relevant work. However, the VE testified that there were jobs within the light work category that she could perform. These jobs included stuffer of sports equipment, zipper trimmer, and eyeglass frame assembler.[50] (Tr. 36-39.)

---

[50]According to the <u>Dictionary of Occupational Titles</u>, each of these three jobs involve sedentary work (exerting up to ten pounds of force occasionally and a negligible amount of work frequently). The jobs of

The ALJ also had the VE assume that Devereaux was psychologically limited to the extent found in Dr. Partap's assessment. Under this hypothetical, the VE testified that Devereaux would not be able to find work in the national and state economies. The VE stated that his testimony was consistent with the <u>Dictionary of Occupational Titles</u>. (Tr. 39-43.)

### III.  DECISION OF THE ALJ

The ALJ found Devereaux suffered from degenerative disk disease of the lumbar spine, depression, and pain stemming from surgeries on her wrists, elbows, and knees, and that these impairments were severe. Devereaux had been hospitalized for her depression, and was admitted for an overdose on one occasion. The ALJ noted that her mental illness had improved with medication. (Tr. 15-18.)

Devereaux complained of joint pain, and had undergone surgery on her wrists, hands, and knees, but the ALJ noted that recent x-rays had revealed no obvious significant abnormalities. And despite reports of chronic pain, there was no definitive diagnosis of fibromyalgia. The ALJ also concluded that any case of fibromyalgia was not a severe impairment likely to last for a continuous period of twelve months. (Tr. 18.)

Devereaux suffered from a history of back pain, with degenerative changes, disk bulges, and disk narrowing. Yet, the ALJ discounted these complaints because the doctors had not recommended surgery, and there was no evidence Devereaux had participated in physical therapy. A consultative examination revealed Devereaux had a normal musculoskeletal system with no abnormalities. (<u>Id.</u>)

Taken as a whole, the ALJ concluded that Devereaux retained the

---

stuffer and zipper trimmer require a reasoning level of 2 (the ability to carry out detailed but uninvolved instructions and respond to situations with a few concrete variables), while the job of eyeglass frame assembler requires a reasoning level of 1 (the ability to carry out simple one- or two-step instructions and respond to situations with no variables or only occasional variables). U.S. Dep't of Labor, Dictionary of Occupational Titles § 731.685-014, § 692.685-266, § 713.687-018 (4th ed.1991).

residual functional capacity (RFC) to sit, stand, and walk for six hours in an eight-hour workday, and lift ten pounds frequently and twenty pounds occasionally. She could not do any climbing, but could perform simple tasks, respond to simple, routine work changes, and respond to supervisors in a work environment where contact with others was casual and infrequent. (Id.)

In reaching this determination, the ALJ concluded that Devereaux's impairments could be expected to produce the alleged symptoms, but that her statements concerning the intensity, persistence, and limiting effects of those symptoms were not entirely credible. In particular, the ALJ noted that Devereaux had not been entirely compliant with her medication. And when she was compliant, her mental functioning improved. In addition, the ALJ found that Devereaux was fairly active in her daily activities, caring for her disabled husband and children. In a recent visit with Dr. Partap, she noted cooking and doing chores around the house. She also reported sleeping well and having no side effects from her medications. The ALJ found these daily activities detracted from Devereaux's physical and mental complaints, and indicated she was capable of simple, light work. (Tr. 18-20.)

The ALJ discounted the RFC of Dr. Partap as inconsistent with his own treatment notes. At the same time, even Dr. Partap's RFC assessment concluded Devereaux could perform simple tasks, deal with stress, interact with others, maintain adequate concentration, respond to changes in a routine work setting, and complete a normal work day without interruption. (Tr. 20.)

Looking to the testimony of the VE, the ALJ concluded that Devereaux could perform work as a stuffer, zipper trimmer, and eyeglass frame assembler. The ALJ did not believe she could perform the full range of light work. Accordingly, the ALJ found Devereaux was not disabled within the meaning of the Social Security Act. (Tr. 21-22.)

## IV.  GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings are supported by substantial evidence in the record as a whole. Pelkey v. Barnhart, 433

F.3d 575, 577 (8th Cir. 2006). "Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion." Id. In determining whether the evidence is substantial, the court considers evidence that detracts from, as well as supports, the Commissioner's decision. See Prosch v. Apfel, 201 F.3d 1010, 1012 (8th Cir. 2000). As long as substantial evidence supports the decision, the court may not reverse it merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, a claimant must prove she is unable to perform any substantial gainful activity due to a medically determinable physical or mental impairment that would either result in death or which has lasted or could be expected to last for at least 12 months. See 42 U.S.C. §§ 423(a)(1)(D), (d)(1)(A), 1382c(a)(3)(A). A five-step regulatory framework governs the evaluation of disability in general. See 20 C.F.R. §§ 404.1520, 416.920; see also Bowen v. Yuckert, 482 U.S. 137, 140-42 (1987) (describing the five-step process); Fastner v. Barnhart, 324 F.3d 981, 983-84 (8th Cir. 2003). If the Commissioner finds that a claimant is disabled or not disabled at any step, a decision is made and the next step is not reached. 20 C.F.R. §§ 404.1520(a)(4); 416.920(a)(4).

Here, the Commissioner determined that Devereaux maintained the residual functional capacity to perform work as a stuffer, zipper trimmer, or eyeglass frame assembler.

## V. DISCUSSION

Devereaux argues the ALJ's decision is not supported by substantial evidence. First, Devereaux argues that the ALJ failed to properly consider her RFC. Second, she argues that the ALJ failed to articulate a legally sufficient rationale for discrediting Dr. Partap's opinion. Third, she argues the ALJ failed to fully and fairly develop the record when he only gave Dr. Partap ten days to respond to his inquiry. Fourth, Devereaux argues the ALJ failed to properly consider her subjective complaints. Finally, Devereaux argues that the ALJ's

hypothetical question to the VE did not adequately capture the consequences of her impairments. (Doc. 17.)

**Residual Functional Capacity**

Devereaux argues the ALJ failed to properly consider her RFC.

The RFC is a function-by-function assessment of an individual's ability to do work-related activities based on all the evidence. <u>Casey v. Astrue</u>, 503 F.3d 687, 696 (8th Cir. 2007). The ALJ retains the responsibility of determining a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians, examining physicians, and others, as well as the claimant's own descriptions of her limitations. <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217-18 (8th Cir. 2001). Before determining a claimant's RFC, the ALJ must evaluate the claimant's credibility. <u>Id.</u> Ultimately, the RFC is a medical question, which must be supported by medical evidence contained in the record. <u>Casey</u>, 503 F.3d at 697; <u>Lauer v. Apfel</u>, 245 F.3d 700, 704 (8th Cir. 2001).

In this case, the ALJ found Devereaux's statements concerning the intensity, persistence, and limiting effect of her symptoms not completely credible. Ultimately, the ALJ concluded that Devereaux retained the ability to sit, stand, and walk for six hours in an eight-hour workday, and lift ten pounds frequently and twenty pounds occasionally. She could not do any climbing, but could perform simple tasks, respond to simple, routine work changes, and respond to supervisors in a work environment where contact with others was casual and infrequent. Substantial medical evidence supports these findings.

In her disability application, Devereaux alleged she became disabled due to knee problems, arm problems, carpal tunnel syndrome, back pain, severe depression, and panic attacks.

After her knee surgeries, Devereaux had good range of motion in each knee, and no longer had the pain she once had. She reported being very happy with the results of the surgeries. In fact, despite all of her doctors' visits, Devereaux rarely complained of knee pain following her surgery. <u>See</u> <u>Stephens v. Shalala</u>, 46 F.3d 37, 38 (8th Cir. 1995) (per curiam) (discrediting later allegations of back pain when no

complaints were made about back pain while receiving other treatment).

Several x-rays of her elbows showed no bony or joint abnormalities. Multiple MRIs revealed that the tendons and muscles around the elbow were normal. Dr. Meadows diagnosed Devereaux with epicondylitis, but cleared her to return to work, albeit with some restrictions. Dr. Kopp made a similar diagnosis and recommendation. Dr. Brown cleared her to work without restriction, after tests for cubital and carpal tunnel syndrome were negative. See Hensley v. Barnhart, 352 F.3d 353, 357 (8th Cir. 2003) ("[N]o functional restrictions were placed on [claimant's] activities, a fact that we have previously noted is inconsistent with a claim of disability."). Dr. Brown found she had good grip strength and active range of motion in her elbows, wrists, and fingers. Dr. Schlafly also noted good grip strength and range of motion. Dr. Akduman, reviewing an MRI, found no evidence of epicondylitis. Nerve conduction studies were well within normal limits and unrevealing. See Stephens v. Shalala, 50 F.3d 538, 541 (8th Cir. 1995) (the lack of objective findings to support pain is strong evidence of the absence of a severe impairment). Dr. Volarich found Devereaux had full range of motion in the elbows, but recommended she avoid lifting more than five or ten pounds.

After reviewing an MRI of her back, Dr. Szoko found no evidence of any fractures, subluxation, or bone destruction, but noted a disk bulge without herniation. See Guilliams v. Barnhart, 393 F.3d 798, 802 (8th Cir. 2005) (finding the ALJ properly discounted claimant's complaints where an MRI revealed largely normal alignment and curvature of the spine, no muscle spasms, and no tender points). Dr. Raghavan found no obvious nerve compression in her back, but noted Devereaux suffered from degenerative disk disease. Neither doctor recommended back surgery. See Craig v. Chater, 943 F.Supp. 1184, 1189 (W.D. Mo. 1996) ("Allegations of a disabling impairment may be properly discounted because of inconsistencies such as minimal or conservative treatment.").

After being admitted to the Hyland Center, Devereaux was cooperative. She was neither manic nor psychotic, and showed no signs of homicidal or suicidal ideation. She reported feeling better physically, with a more stable mood. Provided she took her medication,

Dr. Ahmad believed Devereaux did not have any mental limitations. <u>See</u> <u>Hutton v. Apfel</u>, 175 F.3d 651, 655 (8th Cir. 1999) ("Impairments that are controllable or amenable to treatment do not support a finding of total disability."). Dr. Singer found she suffered from anxiety-related disorders, but that these impairments were non-severe. Dr. Singer also noted that Devereaux had not suffered any extended episodes of decompensation. <u>See</u> <u>Rose v. Apfel</u>, 181 F.3d 943, 945 (8th Cir. 1999) (finding claimant was not disabled because, among other reasons, she had not had any episodes of decompensation). In visits with Dr. Kooi, Devereaux denied hallucinations and other psychotic symptoms, describing her mood as improved. In her most-recent visits with Dr. Partap, Devereaux described being able to ignore her hallucinations. She was also able to go places, do chores, and care for her husband, though she was a little paranoid when she went out sometimes. <u>See</u> <u>Roberson v. Astrue</u>, 481 F.3d 1020, 1025 (8th Cir. 2007) (caring for a child, driving, fixing simple meals, doing housework, and shopping for groceries did not support claimant's alleged inability to work). Her appearance, affect, and attitude were consistently good during these sessions.

After reviewing the record, substantial medical evidence supports the ALJ's RFC determination.

**Weighing Medical Testimony**

Devereaux argues that the ALJ failed to articulate a legally sufficient rationale for discounting the opinion of Dr. Partap.

The ALJ has the role of resolving conflicts among the opinions of various treating and examining physicians. <u>Pearsall</u>, 274 F.3d at 1219. 2001). The ALJ may reject the conclusions of any medical expert, whether hired by the government or the claimant, if they are inconsistent with the record as a whole. <u>Id.</u> Normally, the opinion of the treating physician is entitled to substantial weight. <u>Casey</u>, 503 F.3d at 691. The opinion of a consulting physician, who examines a claimant once, or not at all, generally receives very little weight. <u>Singh v. Apfel</u>, 222 F.3d 448, 452 (8th Cir. 2000).

Still, the opinion of the treating physician is not conclusive in

determining disability status, and must be supported by medically acceptable clinical or diagnostic data. Casey, 503 F.3d at 691. The ALJ may credit other medical evaluations over the opinion of a treating physician if the other assessments are supported by better or more thorough medical evidence, or when the treating physician's opinions are internally inconsistent. Guilliams, 393 F.3d at 803; Cantrell v. Apfel, 231 F.3d 1104, 1107 (8th Cir. 2000). In determining how much weight to give a treating physician's opinion, the ALJ must consider the length of the treatment relationship and the frequency of examinations. Casey, 503 F.3d at 692.

In this case, the ALJ discounted the opinion of Dr. Partap. In doing so, the ALJ noted that Dr. Partap's assessment was inconsistent with his treatment notes – both from before and after the hearing. Dr. Partap began treating Devereaux in September 2006. During that visit, he assigned her a GAF score of 50. On November 1, 2006, Devereaux told Dr. Partap she was going places, sleeping better, and experiencing relief from her hallucinations and delusions. In general, she noted feeling improved. During that visit, Dr. Partap found her appearance and affect unremarkable. On November 20, 2006, Dr. Partap completed a mental RFC questionnaire. In the questionnaire, he noted her condition was improved, but assigned her a GAF score of 35. He also characterized her as seriously limited in every aptitude category, and checked the box indicating Devereaux's symptoms could be expected to last for at least twelve months. In a subsequent session, on January 30, 2007, Devereaux told Dr. Partap she was still able to go places, was doing chores, did not have any auditory hallucinations, and was able to ignore her visual hallucinations. In March 2007, Devereaux again noted improvement. In April 2007, she reported having no complaints, and spending her time caring for her disabled husband. In June 2007, she was still successfully ignoring her visual hallucinations, and her auditory hallucinations were insignificant. She was able to do chores and go shopping.

Reviewing the record, there is no detailed support for Dr. Partap's conclusion that Devereaux's impairments could be expected to last twelve months. See Browning v. Sullivan, 958 F.2d 817, 823 (8th Cir.

1992) (noting that a conclusory diagnosis letter does not overcome substantial evidence to the contrary). In addition, Dr. Partap's conclusions are contrary to his own treatments notes. In his opinion, the ALJ noted these internal inconsistencies. The ALJ articulated a sufficient reason for discounting the opinion of Dr. Partap. See Guilliams, 393 F.3d at 803; Cantrell, 231 F.3d at 1107.

**Develop the Record**

Devereaux argues the ALJ failed to fully develop the record when he only gave Dr. Partap ten days to respond to his inquiry.

A social security hearing is a non-adversarial proceeding, which requires the ALJ to fully and fairly develop the record. Ellis v. Barnhart, 392 F.3d 988, 994 (8th Cir. 2005). And while the duty to fully develop the record may include the obligation to recontact a treating physician for clarification of an opinion, "that duty arises only if a crucial issue is undeveloped." Id.

In this case, Dr. Partap appears to have responded to the inquiry by sending his past treatment notes (the record contains two copies of Dr. Partap's treatment notes for the period up until the ALJ's letter of inquiry), as well as notes from subsequent visits. In fact, the record contains treatment notes from dates well beyond the ten-day limitation. More to the point, Devereaux does not argue that the record is missing any relevant medical records. Indeed, the record before the court is over 760 pages long, with most of the record devoted to Devereaux's medical history. The ALJ fully and fairly developed the record.

**Subjective Complaints**

Devereaux argues the ALJ failed to properly consider her subjective complaints.

The ALJ must consider a claimant's subjective complaints. Casey, 503 F.3d at 695 (citing Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984)). In evaluating subjective complaints, the ALJ must consider the objective medical evidence, as well as the so-called Polaski factors. Guilliams, 393 F.3d at 802. These factors include:

1) the claimant's prior work history; 2) the claimant's daily activities; 3) the duration, frequency, and intensity of the claimant's pain; 4) precipitating and aggravating factors; 5) dosage, effectiveness, and side effects of medication; and 6) functional restrictions. Id.; O'Donnell v. Barnhart, 318 F.3d 811, 816 (8th Cir. 2003). While these factors must be taken into account, the ALJ does not need to recite and discuss each of the Polaski factors in making a credibility determination. Casey, 503 F.3d at 695.

The ALJ may discount subjective complaints of pain, when the complaints are inconsistent with the evidence as a whole. Id. However, the ALJ may not discount a claimant's allegations of disabling pain simply because the objective medical evidence does not fully support those claims. O'Donnell, 318 F.3d at 816. When rejecting a claimant's complaints of pain, the ALJ must "detail the reasons for discrediting the testimony and set forth the inconsistencies found." Guilliams, 393 F.3d at 802. If the ALJ explicitly discredits the claimant's testimony and gives good reason for doing so, the reviewing court "will normally defer to the ALJ's credibility determination." Casey, 503 F.3d at 696.

The ALJ set out the Polaski factors in his decision, and addressed several of the factors in discounting Devereaux's subjective complaints. The ALJ discussed Devereaux's daily activities, and found these activities detracted from her overall credibility. The ALJ also discussed the efficacy of her medication, the side effects of her medication, and Devereaux's instances of non-compliance. Finally, the ALJ noted Devereaux's statements to Dr. Partap about her condition improving. Under the circumstances, the ALJ followed the Polaski factors, and gave a good reason for discrediting Devereaux's subjective complaints.

**Hypothetical Question**

Finally, Devereaux argues that the ALJ's hypothetical question to the VE did not adequately portray the consequences of her impairments.

The Commissioner can rely on the testimony of a VE to satisfy his burden of showing that the claimant can perform other work. Robson v. Astrue, 526 F.3d 389, 392 (8th Cir. 2008). For the VE's testimony to

rise to substantial evidence, the ALJ's hypothetical question must be correctly phrased and must capture the concrete consequences of the claimant's deficiencies. Id. The ALJ's hypothetical question does not have to include all of the claimant's alleged impairments; it need include "only those impairments that the ALJ finds are substantially supported by the record as a whole." Lacroix v. Barnhart, 465 F.3d 881, 889 (8th Cir. 2006).

During the hearing, the ALJ's hypothetical question had the VE assume that Devereaux could lift and carry up to twenty pounds occasionally and ten pounds frequently, and could sit, stand, and walk for six hours in an eight-hour day. The ALJ also had the VE assume that Devereaux could understand, remember, and carry out at least simple instructions and non-detailed tasks, respond appropriately to supervisors and co-workers, and adapt to routine, simple work changes. This hypothetical corresponded to the ALJ's ultimate RFC determination. Looking to Lacroix and Robson, the hypothetical question to the VE was correctly phrased and captured the consequences of Devereaux's impairments.

## VI. RECOMMENDATION

For the reasons set forth above, it is the recommendation of the undersigned that the decision of the Commissioner of Social Security be affirmed under Sentence 4 of 42 U.S.C. § 405(g).

The parties are advised that they have ten days to file written objections to this Report and Recommendation. The failure to file timely written objections may waive the right to appeal issues of fact.


　　　　　　　　　　　　／S／　　David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on February 20, 2009.

-35-